# **AFFIDAVIT**

I, STEPHEN O'CONNELL, hereby depose and state as follows:

1. I have been a Special Agent of the Internal Revenue Service – Criminal Investigation ("IRS-CI") since October 2019. I am assigned to its Boston, Massachusetts Field Office where I investigate tax evasion, money laundering, wire fraud, and conspiracies, among other federal criminal offenses. I have participated in the execution of warrants involving the search and seizure of computers and electronically stored information. I attended the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in conducting financial investigations and in IRS-CI policies and procedures. I hold a Bachelor's degree in Equine Business Management from Johnson and Wales University and Master's degrees in Accounting and Business Administration from Northeastern University. I have been a Certified Fraud Examiner with the Association of Certified Fraud Examiners since September 2017.

2. I am investigating MARIA AUXILIADORA REZENDE, a co-conspirator whose identity is known to me ("CC-1"), and unknown others for wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 ("the Target Offenses").

3. I submit this affidavit in support of an application for a criminal complaint charging REZENDE with wire fraud, in violation of 18 U.S.C. § 1343. As detailed herein, there is probable cause to believe that between at least in or about December 2020 through the present, REZENDE, CC-1, and others worked with each other and others known and unknown to perpetrate a fraud scheme against Victim A, an 85-year-old man suffering from end-stage renal disease, confusion, and a medical assessment suggesting Alzheimer's dementia.

4. I also submit this affidavit in support of an applications for a warrant to search REZENDE's person (the "Subject Person"), as described in Attachment A to the proposed warrant. As further detailed below, there is probable cause to believe that the Subject Person contains evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B to the proposed warrant.

**PROBABLE CAUSE TO BELIEVE THAT FEDERAL CRIMES WERE COMMITTED**

5. REZENDE, a Brazilian national, arrived in the United States on a on a K-1 fiancé visa in 2010. Since at least 2012, REZENDE has lived in Massachusetts and is a Lawful Permanent Resident.

6. CC-1 lived in Tennessee.

7. Victim A is an 85-year-old retired professor who lives in Massachusetts. According to Victim A's adult children, Victim A suffers from end-stage renal disease, confusion, and a medical assessment suggesting Alzheimer's dementia.

8. According to Victim A's adult children, in or about July 2013, Victim A purportedly met REZENDE through a class that he was teaching and began a romantic relationship. Victim A's children have obtained and shared with me an email between REZENDE and Victim A from July 2013 in which Victim A told REZENDE that he had done research about hair extensions in Brazil and asked REZENDE a series of questions about her plans to open a business focusing on hair extensions.

9. Starting in or about 2016, Victim A's children became concerned about the nature of Victim A's relationship with REZENDE and began asking Victim A questions about REZENDE. After receiving unsatisfactory responses, Victim A's children undertook a subsequent investigation, including retaining counsel in Brazil, as detailed herein. As a result of that

investigation, they discovered that Victim A had sent more than $1 million to REZENDE, CC-1, and related businesses over a course of years, as discussed below.

10. According to Victim A's children, REZENDE told Victim A that she was the illegitimate daughter of Iris Rezende, a former Brazilian politician, and that she was in line to inherit valuable farmland in the area of Goiânia, Brazil, after the inheritance taxes were paid and it went through the probate process.

11. There is probable cause to believe that in or about 2020, REZENDE introduced Victim A to purported attorneys located in Brazil that were allegedly assisting her with probate and collection of a Brazilian inheritance tax, also known as "Imposto Sobre Transmissao Causa Mortis e Doacas" or ITCMD, which translates to "tax on transmission due to death or donation" in English. The tax was purportedly related to farmland REZENDE was inheriting.

12. I have reviewed emails and messages Victim A exchanged with purported Brazilian attorneys regarding the ITCMD for REZENDE's alleged farmland. These messages show that, in or about September 2020, Victim A agreed to provide funds to pay the ITCMD in exchange for an ownership interest in the farmland. Victim A entered a contract with REZENDE, allegedly drawn up by the purported attorneys in Brazil, in which they formed a holding company to own the farmland. Victim A had a 49 percent interest in the holding company, and REZENDE held a 51 percent interest.

13. A draft amendment to this contract between Victim A and REZENDE stated, "It is hereby agreed by both parties that, should there be any criminal charge or legal action brought against MARIA AUXILIADORA REZENDE or any member of her family, by [Victim A] or any member of his family, this PROMISE TO ASSIGN HEREDITARY RIGHTS will be instantly made null and void."

14. To induce Victim A to enter this agreement, REZENDE and the purported attorneys in Brazil sent Victim A descriptions of the farmlands that made the farmland appear both legitimate and valuable. For example, I have reviewed an email from a purported Brazilian attorney, CC-2 , dated May 17, 2021, in which CC-2 sent Victim A information pertaining to four properties and their 2020 profits. On or about October 3, 2021, CC-2 sent Victim A a copy of the proposed ITCMD payment schedule for three of the farms located in Brazil. As shown in the copy of this email below, CC-2 copied REZENDE at the email address dorarezende36@gmail.com, along with purported Brazilian attorneys CC-3 and CC-4

From: =/b> CC-2 @gmail.com>
Subject: =/b>Re: New =arms
Date: =/b>October 3, 2021 at 7:30:13 PM =DT
To: =/b> Victim A <Victim A@mit.edu>
Cc: =/b>Dora Rezende <dorarezende36@gmail.com>, CC-3 @gmail.com, CC-4 @gmail.com>

Victim A

I am sending you the =ayment schedule for the three properties as defined by Mr. Lázaro's =ffice.
I put the Santa Maria farm =irst, as it is the least valuable. But the order in which they are paid =oesn't make any difference, it's up to you to decide whether you want =o start with the cheapest.
Remembering =hat if possible, make the deposit in Maria's account until the 8th of =ach month, so that the money is in Brazil's account in a timely manner =or us to pay on time.
It was then, as =ollows:

Rochedo Farm:

Last =nstallment on 10/10/2021: R$ 132,800.00

Santa Maria Farm: Total R$: 587,000.00

10/10/2021: R$: 117,400.00
11/10/2021: R$: 117,400.00
12/10/2021 R$: 117,400.00
10/01/2022 R$: 117,400.00
02/10/2022 R$: 117,400.00

Pontal Farm: Total: BRL 746,000.00

03/10/2022: R$: 149,200.00
04/10/2022: R$: 149,200.00
05/10/2022: R$: 149,200.00
06/10/2022: R$: 149,200.00
07/10/2022: R$: 149,200.00

Cruzeiro Farm: Total: BRL 868,000.00

08/10/2022: R$: 173,600.00
09/10/2022: R$: 173,600.00
10/10/2022: R$: 173,600.00
11/10/2022: R$: 173,600.00
12/10/2022: R$: 173,600.00

Thus, we =ill finally be able to close Maria's inventory, with a value well above =ur initial expectation.

15. In another email to Victim A, dated October 19, 2021, on which REZENDE is copied, CC-2 described the land and provided a full inventory of the farm. Over the course of the scheme, CC-2 provided Victim A with additional information about REZENDE's Brazilian

properties. For example, CC-2 provided the update pictured below, dated August 9, 2023, for the purported REZENDE farmland known as “Rio Quente 1”:



8/9/23

Rio Quente 1

Second Crop Corn 2022

| Nº | Description | Amount |
|---|---|---|
| 1 | 1000 hectares of plantation | N/A |
| 2 | Average cost per hectare - labor, raw materials, fertilizers, pesticides, sowing, harvesting, and maintenance of the soil in preparation for the soybean crop | R$: 3,246.30 |
| 3 | Expenses accrued between crops | R$: 6,491,578.40 |
| 4 | Expenses with third-party service providers (siloing/storage, transportation, distribution, sales commissions, and expected losses during cargo transportation | R$: 7,458,629.34 |
| | | |
| | **Total Cost of the 2022 Crop** | **R$: 13,950,207.74** |
| | | |
| **Nº** | **Description** | **Amount** |
| 1 | Average quantity of bags yielded per hectare | R$: 281.49 |
| 2 | Average price of of one bag in 2022 | R$: 76.59 |
| 3 | Quantity of bags harvested from both crops | 281,490 |
| | **Total Sales From 2022 Crops** | **R$: 21,559,319.10** |
| | | |
| | **Description** | **Amount** |
| | Reinvestment/Reserve (40%) | R$: 3,043,644.54 |
| | **Net Profit** | **R$: 4,565,466.82** |

2021/2022 Soybean Harvest

| Nº | Description | Amount |
|---|---|---|
| 1 | 1400 hectares of plantation | N/A |
| 2 | Average cost per hectare - labor, raw materials, fertilizers, pesticides, sowing, harvesting, and maintenance of the soil in preparation for the soybean crop | R$: 4,742.60 |
| 3 | Expenses accrued between crops | R$: 6,718,264.00 |
| 4 | Expenses with third-party service providers (storage, transportation, distribution, and expected losses during cargo transportation) | R$: 3,389,433.60 |
| | | |
| | **Total Cost of the 2022 Crop** | **R$: 10,107,697.60** |
| | | |
| **Nº** | **Description** | **Amount** |

16. I have reviewed additional emails, text messages, Telegram messages, and WhatsApp messages Victim A received from REZENDE, CC-1, and the purported Brazilian attorneys as well as financial records for Victim A. These records show that Victim A made regular payments he described as payments towards the ITCMD and legal fees to the purported Brazilian attorneys involved in the handling of REZENDE’s inheritance.

17. For example, on or about December 5, 2020, Victim A emailed CC-2 and said that he had spoken to REZENDE and would be sending her “what is required” for the first ITCMD payment. Victim A added that the check would go directly into REZENDE’s account at her local

bank in the United States. Victim A noted that REZENDE suggested he should describe the payment as: "Payment 1 of 5 for ITCMD concerning the farm Araguaia Aguas that is part of the Inventory of Maria A. Rezende" on the memo line.

18. On or about December 7, 2020, CC-2 sent Victim A the email pictured below regarding the payment of ITCMD. CC-2 copied REZENDE and the two other purported attorneys, CC-3 and CC-4 .

From: CC-2 @gmail.com>
Subject: Re: Alinhamento
Date: December 7, 2020 at 7:48:13 AM EST
To: Victim A <Victim A@mit.edu>
Cc: Dora Rezende <dorarezende36@gmail.com>, CC-3 @gmail.com,
CC-3 @gmail.com

Good morning mr. Victim A!

50

Here are some clarifications on the current fees being charged. In the same way that Maria was charged the ITCMD fee for the goods that are in her father's name, this time the fee for the farm that is already in Maria's name is being charged. So, this is a new inventory, in Maria's name, without any connection with the other goods she will receive as an inheritance. We are only using her father's team to carry out this process because he (Mr. Lázaro) offered financial and legal support from his team, which makes the costs considerably less. However, this is a new registration of assets, all in Maria's name, totally separate from the other assets that are in her father's name and that should be divided. This farm is already hers, so she can determine who will be her legal heir. Hence, our interest in carrying out the registration as soon as possible, in order to formalize in a document what Maria's will is (which is to name you as the sole heir to her assets, both of which today is in the name of her father, and of this new inventory that deals with the goods that are already in her name). About the description of what will be written on the check, what Maria suggested, is perfect. But, in any case, we will issue a new receipt, registered with a notary, containing the payment details. If you have any further questions, I'll be happy to clarify.
Sincerely
CC-2
---------------------------------------------
Tradução

19. As another example, on or about October 25, 2024, Victim A received a WhatsApp message from an individual calling himself CC-5 another purported Brazilian attorney, discussing monthly payments in relation to ITCMD payments, as pictured below:

> [10/25/24, 3:28:33 PM] - CC-5 Victim A
>
> Here is all the information with regards to the various payments.
>
> Maria's Payments
>
> So there are two distinct payments that Maria has been making since September: one for the loan, which includes principal plus interest, and a different one for the ITCMD, which was the motivation for her taking out the loan. They are as follows:
>
> MONTHLY LOAN PAYMENT: R$ 214,473.42
> MONTHLY ITCMD PAYMENT: R$ 210,000.00
>
> Both of which she will actually have to pay for only 7 months: the ITCMD because it was divided into 7 installments, and the loan because, although it is to be paid over the course of 12 months, the money from the Rio Quente farms, which will already be available in 7 months, will be more than enough to take care of the rest.
>
> Your Payments
>
> Dona Terezinha is asking you to take care only of Maria's loan payments, leaving Maria to pay for the ITCMD with the money lent by the bank.
>
> However, she does not want you to pay the full R$ 214,473.42 Maria is paying per month, which includes fees and taxes on top of principal and interest, but only the part which pertains to principal plus interest, without the additional changes. Hence,
>
> YOUR MONTHLY PAYMENTS: R$ 204,229.30
>
> And she is asking for you to make 7 of these payments, to include the period from September until funds from the farms are available.
>
> The 50,000 USD you have already paid was enough for her to dispense with other prospective deals and secure your deal with her, but she does want the past two months (October, September) to be fully covered before signing the Acknowledgement of Debt.
>
> In terms of Reals:
>
> FIRST TWO PAYMENTS: R$ 408,458.6
>
> The amount of money that Dona Terezinha has received from you, in reals is:
>
> YOUR AMOUNT PAID: R$ 284,625.00
>
> Subtracting that from the first two payments Dona Terezinha is asking, gives us:
>
> RETROACTIVE AMOUNT LEFT: R$ 123,833.60
>
> Which, at this very moment, in dollars, amounts to: 21,687.91 USD.
>
> In summary, you have R$ 123,833.60 in reals left to pay before Dona Terezinha signs Acknowledgement of Debt. After that, she will immediately procede with signing and notarization, and you would have 5 payments of R$ 204,229.30 left to make by the 20th of each month, the very last one being in March.

20. I have reviewed additional messages to Victim A in which conspirators posing as Brazilian attorneys sent Victim A messages with regular updates about the alleged farmland, inheritance tax payments, and other communications.

21. Financial records show that Victim A paid "legal fees" to these purported Brazilian attorneys through REZENDE. For example, on or about April 3, 2025, Victim A sent a $14,686

Zelle payment from his Bank of America account with an account number ending in 1914 ("Victim A's 1914 Account") for purported legal fees for the alleged Brazilian attorney CC-3

Pictured below is an excerpt of the April 2025 monthly statement for Victim A's 1914 Account:

**Withdrawals and other debits**

| Date | Description | Amount |
|---|---|---|
| 04/03/25 | Zelle payment to Maria Rezende for "For April 2025 Expenses+Angela+CC-3"; Conf# zda2gd155 | -14,686.00 |

22. The individual purporting to be CC-3 provided Victim A with receipts from her alleged law firm, CC-3 Advoccia, listing the payments and referencing the ITCMD, which REZENDE signed, as pictured below:



CC-3

ADVOCACIA

**RECIBO**

Eu, Maria Auxiliadora Rezende, brasileira, solteira, portadora do CPF n° 235.560.481-91 com endereço residencial Rua 4 n° 60 Ap 102 Setor Oeste, Goiânia – GO CEP: 74110-140.

Informo que recebi do sr. Victim A, americano, inscrito no social security number (TAX ID): [redacted]3308, residente e domiciliado [redacted] Newton, MA 02467 USA, a importância de USD$: 64.500,00 (Sessenta e cinco mil e quinhentos dólares) referente ao pagamento da taxa de ITCMD do inventario de Maria Auxiliadora Rezende, sendo USD$: 28.500,00 referente a parcela 2 de 5 do ITCMD da fazenda de Uberlândia e USD$: 36.000,00 referente as parcelas 1 e 2 de 5 do ITCMD da fazenda São Miguel no Araguaia

Goiânia, 02 de Março de 2021

Maria Auxiliadora Rezende

CARTÓRIO ÍNDIO ARTIAGA

23. In addition to purported legal fees, Victim A made what he thought were ITCMD payments directly to REZENDE. For example, on or about August 15, 2023, Victim A sent REZENDE a Zelle payment for $15,000 with the message, "ITCMD Rio Quente 1 and 2, 8-15-23 [Victim A's initials] to MAR." On or about August 16, 2023, Victim A sent REZENDE a Zelle

payment for $6,400 with the message, "ITXMD Rio Quente 1 and 2, 8-16-23 [Victim A's initials] to MAR."

24. In addition to receiving funds to her personal account, REZENDE directed Victim A to send payments for the ITCMD through her purported business, Human Hair Extension. For example, as pictured below, on or about September 9, 2021, Victim A purchased a $25,400 cashier's check on his 1914 Account payable to Human Hair Extension, with a handwritten note on the check stating, "Payment of ITCMD (4 of 5) for Rochedo Farm from [Victim A] for Maria A. Rezende." Bank records show that REZENDE deposited the check into a TD Bank account with an account number ending in 2687 ("the HHE 2687 Account").


BANK OF AMERICA

Cashier's Check

No. 1421913621

Void After 90 Days

30-1/1140 NTX

Date 09/09/21 04:11:45 PM

NEWTON CENTRE - BEACON

0010 0080641 0158

Pay BANK OF AMERICA 25400 00 CTS CTS

**$25,400.00**

**Twenty Five Thousand Four Hundred and 00/100 Dollars**

To The Order Of HUMAN HAIR EXTENSIONS

Payment of ITCMD (4 of 5) for Rochedo Farm from Victim A to Maria A. Rezende

Remitter (Purchased By): CLARRELL INC

Bank of America, N.A. SAN ANTONIO, TX

AUTHORIZED SIGNATURE

⑈1421913621⑈ [redacted] 0019⑆ [redacted] 5388⑈

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK. HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENTS.

TD Bank

America's Most Convenient Bank

You're Cool... I know it and you know it!

If we haven't provided you with legendary service, please contact us at 1-866-803-5812.

25. Victim A also wired what he believed were ITCMD funds to REZENDE via Human Hair Extensions. For example, on or about January 19, 2021, Victim A wired $29,500 from his 1914 Account to the HHE 2687 Account. The wire confirmation listed the address for Human Hair Extensions as 388 Ocean Ave, Apt 1402, Revere, MA 02151, which law enforcement databases show is REZENDE's residence. The wire confirmation included a note "ITCMD (1 of 5) for Fazenda Uberlandia to Maria A Rezende from [Victim A's initials]."

BANK OF AMERICA

**Funds Transfer Request Authorization (FTRA)**

**Customer Information**

| | | | |
|---|---|---|---|
| Name: | CLARRELL INC | Address: | 279 COMMONWEALTH AVE<br>CHESTNUT HILL<br>MA 024671012 US |
| Phone: | (617)965-0271 | | |

**Account Information**

| | |
|---|---|
| Account: | BUS_1914 |
| Account Title: | CLARRELL INC |
| Requestor Name: | Victim A |

**Wire Information**

| | | | |
|---|---|---|---|
| Wire Type: | DOMESTIC | Wire Date: | 01/19/2021 |
| Country: | US | Wire Amount (USD): | 29,500.00 |
| Currency of Recipient Account: | USD | Wire Fee: | 0.00 |
| Source: | IN PERSON | | |
| ID Verification/Type: | U.S. DRIVER'S LICENSE (WITH OR WITH | | |
| ID Verification/Type: | BANK OF AMERICA DEBIT CARD, ATM CAR | | |

**Recipient Information**

| | | | |
|---|---|---|---|
| Recipient Name: | HUMAN HAIR EXTENSIONS | Bank Name: | TD BANK NATIONAL ASSOCIATION |
| Account Number Type: | ACCOUNT NUMBER | Bank ID: | [redacted]1266 |
| Account Number: | [redacted]2687 | Address: | 2035 LIMESTONE RD<br>WILMINGTON<br>DE 19808 US |
| Address: | 388 OCEAN AVE<br>APT 1402<br>REVERE<br>MASSACHUSETTS 02151 US | | |

**Information about payment:**

| | | | |
|---|---|---|---|
| Purpose of Payment: | | Additional Phone Advice: | |
| Additional Reference Information: | ITCMD (1 OF 5) FOR FAZENDA UBERLANDIA TO MARIA A REZENDE FROM [redacted] | Additional Bank Instructions: | |

26. Messages and financial records show that, by at least in or about November 2022, Victim A began communicating with CC-1 about REZENDE and sent CC-1 funds intended for REZENDE. Victim A told his family that sending funds intended for REZENDE to CC-1 was much cheaper than using traditional financial institutions to transfer money internationally. Victim

A told his family that he believed that CC-1's use of various companies to transfer money to other people was legitimate, legal, and common practice when it came to international matters.

27. For example, on or about October 25, 2023, CC-1 messaged Victim A, "Maria Auxiliadra Rezende CPF: 235560481-91…."[1] CC-1 continued, "Its for maria account ?" CC-1 then sent Victim A wire information for a business called JK Import Consulting USA LLC in Boca Raton, Florida with an account at Wells Fargo Bank, followed by the message "33.190.0." Victim A responded, "Yes for. Maria Rezende." On or about October 25, 2023, Victim A texted CC-1 an image of a wire confirmation showing he had wired $33,190 from his 1914 Account to JK Consulting USA LLC's Wells Fargo account with an account number ending in 6298. The confirmation noted the wire was for "ITCMD for Rio Quente 1 and 2 October 2023 [Victim A's initials] to MAR." "MAR" are REZENDE's initials. Based on my review of documents in this investiagtion, I understand "Rio Quente 1 and 2" to refer to farmlands REZENDE allegedly owned in Brazil.

[1] CPF is an abbreviation for Cadastro de Pessoas Fisicas, which is an 11-digit taxpayer identification number issued by the Brazilian government.




28. REZENDE, CC-1, and unknown others have continued to cause Victim A to send them money for purported ITCMD payments through 2026.

29. For example, on or about January 15, 2025, at approximately 1:42 P.M., CC-1 messaged Victim A and instructed him to send $34,170 to a business called [redacted] located in Doral, Florida. On or about January 13, 2025, at approximately 8:22 P.M., Victim A texted CC-1 a PDF file titled "Funds Transfer Request Authorization.PDF," which was a wire confirmation from Bank of America showing that Victim A had wired $34,170 from his 1914 Account to a Webster Bank account with an account number ending in 9165 in the name of [redacted]. The confirmation noted the wire was "For ITCMD loan, RQ3+4, Jan '25 [Victim A's initials] to MAR." Again, "MAR" are REZENDE's initials. Bank of America statements for Victim A's 1914 Account show a deduction of $34,170 for a wire transfer on January 13, 2025, to [redacted]:

| | | |
|---|---|---|
| 01/13/25 | WIRE TYPE:WIRE OUT DATE:250113 TIME:1620 ET TRN:2025011300584097 SERVICE REF:016838 BNF:[redacted] ID:[redacted]9165 BNF BK:WEBSTER BANK , N.A. ID:021913655 PMT DET:SZ4UQJTMJ POP Services /ACC/For ITCMD loan, RQ3+4, Jan '25//[redacted] to MAR | -34,170.00 |

30. On or about January 14, 2026, Victim A messaged CC-1 and wrote, "I want to send $15,000 to Maria Rezende. Need for tomorrow afternoon." CC-1 responded with instructions to send $15,000 to a Chase Bank account in the name of a business called [redacted] and [redacted] with an address in Opa-Locka, Florida.

31. On or about January 15, 2026, Victim A sent CC-1 an image of a wire confirmation showing Victim A had wired $15,000 from his 1914 Account to a Chase Bank account with an account number ending in 5659 in the name of [redacted] and [redacted]. The confirmation noted that Victim A had indicated the wire was "From [Victim A's initials] to MAR for CC-3 Jan 2026." As previously noted, "MAR" are REZENDE's initials.


I want to send $15,000 to Maria Rezende. Need for tomorrow afternoon.
Ok
[redacted]
Chase Bank
Account number: 5659
Routing number WIRE: 021000021
SWIFT code: CHASUS33
Company Address:
13700 NW 19TH AV, UNIT 13, OPA- LOCKA, FL 33054
Bank Address:
18235 Biscayne Blvd, Aventura, FL 33160
15.000.00
Will this be good tomorrow (Thurs) afternoon?
Yes
Thu, Jan 15 at 5:28 PM
Please send me receipts
Thu, Jan 15 at 9:09 PM

BANK OF AMERICA

**Funds Transfer Request Authorization**

**SENDING INFORMATION**

| | | | | | |
|---|---|---|---|---|---|
| **Wire type:** | Domestic | **Wire date:** | 01/15/2026 | **Remittance ID:** | VL2MHGEY3 |
| **Requestor name:** | Victim A | **Client party ID:** | 35026735063 | **Account number (last four):** | 1914 |
| **Client name:** | Victim A | **Account title:** | CLARRELL INC. | | |

**RECIPIENT ACCOUNT INFORMATION**

| | | | |
|---|---|---|---|
| **Recipient name:** | [redacted] | **Bank name:** | JPMorgan Chase Bank, National Association |
| **Account number:** | [redacted]559 | **Bank ID/ABA routing number:** | 021000021 |
| **Recipient address:** | 13700 NW 19th Ave<br>Unit 13<br>OPA-LOCKA FL 33054 | **Bank address:** | 1111 Polaris Pkwy<br>Columbus OH 43240 |
| **Country:** | US | **Country:** | US |

**Business contact name:** Victim A

**Business contact phone:** [redacted]426

**Additional bank instructions:** From [redacted] to MAR for Eliane Jan 2026

**TRANSFER AMOUNT WITH FEES**

| | |
|---|---|
| **Transfer amount (USD)** | $15,000.00 |
| **Transfer fees** | +$30.00 |
| **Total** | $15,030.00 |

**AUTHORIZATION**

(sign here)

I authorize Bank of America, N.A. ("Bank of America") to transfer funds as set forth in the instructions herein, and agree that such transfer of funds is subject to this Funds Transfer Agreement (see next pages) and applicable fees. If this is a foreign currency wire transfer, I accept the currency exchange rate provided by Bank of America at the time the wire is sent.

32. I have reviewed financial records and communications showing that CC-1 directed Victim A to send funds to the following additional entities on behalf of REZENDE: [redacted]. I believe that all of these payments are illegitimate and part of the fraud scheme.

33. REZENDE appears to have had recent contact with CC-1 and continues to have contact with Victim A. For example, on or about November 3, 2026, REZENDE texted Victim A that "[CC-1] has been calling here all day." On or about the same day, Victim A sent REZENDE

a message on Telegram in which he stated, “Urgent to CALL ME. You must send to [CC-1]. I must come there to give you package.”




34. In addition to extracting purported ITCMD payments and legal fees from Victim A, WhatsApp messages show that REZENDE extracted cash payments from Victim A, had Victim A run errands for her, had Victim A make regular payments to individuals that REZENDE alleged were her assistants, and on a monthly basis submitted a list of her personal living expenses for Victim A to pay. For example, the screenshot below shows messages from on or about July 30, 2026, in which REZENDE sent to Victim A a list of her bills for August 2026 that she expected Victim A to pay[2]:

[2] As is common in Brazil, REZENDE appears to use commas (,) as the decimal separator to separate whole currency units (*i.e.*, dollars) from fractional units (*i.e.*, cents), rather than periods (.).




35. Financial records confirm that Victim A paid at least some of these monthly expenses for Victim A. For example, on or about August 3, 2026, Victim A wrote a check to REZENDE's landlord for her rent.

36. In or about April 2025, Victim A began questioning certain aspects of the scheme, including the true identity of one of the purported attorneys, "Attorney A," whose name is known to me. Victim A also sought verification of court dockets and probate filings. Attorney A allegedly worked for CC-3 and communicated with Victim A about REZENDE's inheritance. In response to Victim A's questions, Attorney A sent him the image below in support of his claim that he was a legitimate Brazilian attorney:



As detailed in the next paragraph, there is probable cause to believe the person purporting to be Attorney A was using a real Brazilian attorney's identity without authorization.

37. On or about October 16, 2026, I spoke with Brazilian attorney Andre Jorgetto, whom Victim A's family had hired to investigate the farmland for which Victim A was supposedly funding ITCMD payments.[3] Attorney Jorgetto shared that his investigation determined that REZENDE is not related to Iris Rezende. Additionally, Attorney Jorgetto could not locate any farms in the Goiânia area that matched the descriptions provided to Victim A. Attorney Jorgetto said he had searched the Brazilian probate records and could not identify any matter within the records that confirmed the claims the purported attorneys made to Victim A. Attorney Jorgetto also communicated with the real attorney whose identity Attorney A used. This individual said that he was unaware of the farmland, was not in communication with REZENDE, and had never been in communication with Victim A.

38. Individuals connected to this scheme took Victim A and his family's questions as a form of harassment against the REZENDE family and the purported attorneys themselves. For example, the individual purporting to be Attorney A sent Victim A an email in or about January 2026 stating, "But it is of the utmost importance to find some way to make sure that this doesn't happen again, because not only was this the second time that the family felt antagonized, but it was also much more serious in potential to cause trouble for them. And, since I am the one communicating with you, I am on the same boat. So please help me in keeping all of this confidential to the best of your ability." In the same communication, the individual purporting to

[3] Victim A's family had paid Attorney Jorgetto for the work that he had done for them. IRS-CI did not compensate Attorney Jorgetto for his time. In addition, I confirmed that he is an attorney. Because Attorney Jorgetto has already been compensated for his time according to his actual fee rate, has no other interest in the matter, performed an investigation, and was very knowledgeable about this matter, I believe that Attorney Jorgetto was accurate.

be Attorney A told Victim A to delete their prior communications on WhatsApp, because, he claimed, it was no longer safe and had allegedly been intercepted, and that they could begin communicating on Signal. In or about October 2026, the individual calling herself CC-3 sent a letter to Victim A stating, "As for [Attorney A's] ID, he has left our office for a while now. He left, in fact, shortly after you last spoke with him and that is why we have not provided his ID. We are no longer in a position to provide his identification, nor is there a need, as you will be working with me from now on."

39. Purported attorneys and other individuals connected to REZENDE further alleged to Victim A that Victim A's family had been sending a wave of harassing emails and phone calls and acted in a manner that caused a complaint to be filed against REZENDE. I have reviewed messages in which they pressured Victim A to stop his family from communicating with anyone connected to REZENDE. In one instance, CC-3 told Victim A, "that the liabilities involved are just not worth the concerted effort now being asked of our firm just to keep you as a client." Conspirators sent additional emails to Victim A threatening to end the business relationship between Victim A and REZENDE, alleging that they can no longer speak with Victim A due to the legal risks to REZENDE, and instructing Victim A to delete his communications with them and change communication methods (including to the encrypted application Signal) because their previous communications had been intercepted and it was no longer safe.

40. Additionally, in or about August 2024, REZENDE's purported mother, whose name is known to me, emailed Victim A and said that all of the plans regarding the inheritance of the farmland would be canceled if Victim A was no longer able to assist REZENDE. She added that REZENDE "wants to withdraw from [Victim A and REZENDE's purported business]. She has been repeating for quite a while that she can't take it anymore."

## PROBABLE CAUSE TO BELIEVE THAT THE SUBJECT PERSON CONTAINS FRUITS, EVIDENCE, AND INSTRUMENTALITIES OF THE TARGET OFFENSES

41. As described above, REZENDE and her co-conspirators regularly used electronic communications applications such as Telegram, WhatsApp, Signal, email, text messages, and iMessage to communicate with Victim A. In these messages, REZENDE and her co-conspirators provided Victim A with updates relating to the purported farmland, payment schedules and receipts concerning the purported ICTMD and associated legal fees, and bank account information and instructions on where Victim A was to send funds. As detailed above, REZENDE exchanged text messages with Victim A as recently as November 3, 2026, and sent messages requesting payments on July 20, 2026. Additionally, Victim A sent some payments via Zelle, which I know from my training and experience is accessed via mobile phone or computer.

42. One of Victim A's children recently notified me that, based on information he obtained from Victim A, he believed REZENDE was planning to leave the United States for Brazil with no planned returned date. I confirmed that REZENDE has a flight booked from Boston to Newark on November 10, 2026, and a connecting flight from Newark to Brazil. I have also learned that REZENDE hired a moving and shipping company to transport her possessions to Brazil and asked Victim A pay for it. She also sent Victim A a photo of her apartment full of moving boxes. According to his children, Victim A has told them, "It's possible she may never come back."

43. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through email, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

44. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. iPhones, such as REZENDE's phone, are such a type of phone. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

45. I am aware of a 2024 report from the United States Census Bureau that shows that among all households nationally in 2021, 95 had at least one type of computer, which includes smartphones, and 90 percent had a broadband internet subscription—up from 89 percent (computer) and 82 (internet subscription) in 2016. Smartphones were the most common computing device in U.S. households (90 percent), followed by desktop or laptop computers (81 percent) or tablets (64 percent). Further, according to the Pew Research Center, as of November 2024, 98 percent of adult Americans own a cellphone of some kind, and 91 percent own a smartphone. The percentage of adults that own a smartphone is even higher among younger demographic groups: 98 percent of 18–29-year-olds, 97 percent of 30–49-year-olds, and 91 percent of 50–64-year-olds owned smartphones in 2024. 79 percent of those 65 years and older owned a smartphone.

46. In my training and experience, individuals tend to keep their cell phones on their person. Further, in my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

47. From my experience, I am also aware that travelers often keep their phones, laptops,

and other devices on their person when traveling to provide entertainment, manage their itinerary and hold their electronic tickets, and prevent theft of their devices from checked luggage.

48. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

49. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has

used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which

they were created, although this information can later be falsified.

50. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image

was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

51. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

52. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

53. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-

virus programs (and associated data) may be relevant to establishing the user's intent.

54. The scheme to defraud Victim A began by at least 2013 and continues to the present. Based on my training and experience I know that computers and other electronic devices and databases often store documents, records, and communications with others for a number of years and often remain on these devices until the user chooses to delete them, and even once they are deleted records may still exist on the computer and may still be recoverable. I also know that it is common for individuals to not delete their documents, records, or communications until storage space becomes an issue on their devices with individuals often leaving the majority of their records on their electronic devices for the entirety of the device's life. I also know that electronic communication devices such as smartphones and computers have the ability to back up their data to other electronic devices such as computers and removable storage devices as well as to cloud-based storage devices. In my training and experience, individuals tend to "backup" their cell phones to the "cloud," such that information is accessible despite the passage of time and even if REZENDE replaced her phone during the course of the scheme. Additionally, in my experience, individuals tend to keep communications on their cell phones going back years. Thus, in addition to her recent communications with Victim A, there is probable cause to believe older messages related to the Target Offenses exist on REZENDE's smartphone.

55. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting

rather than in the location where it is seized. This is true because of:

a. The volume of evidence: storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

b. Technical requirements: analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

56. The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

57. Law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) REZENDE. If, however, agents cannot make a determination as to use or ownership regarding any particular device, agents will seize and search that device pursuant to the probable cause established herein.

58. This proposed warrant authorizes a review of electronic storage media seized, copied or disclosed pursuant to the proposed warrant in order to locate evidence, fruits, and instrumentalities described in the proposed warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the IRS may deliver a complete copy of the

seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**UNLOCKING A DEVICE USING BIOMETRIC FEATURES**

59. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

60. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

61. If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match

those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

62. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

63. As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by the proposed warrant.

64. I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint

access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

65. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require REZENDE to press her finger(s) against the sensor of the locked device(s) or place the devices in front of her face in order to attempt to identify the device's user(s) and unlock the device(s).

66. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to the proposed warrant and may be unlocked using one of the aforementioned biometric features, the proposed warrant permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of REZENDE to the fingerprint scanner of devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of REZENDE's face and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of REZENDE's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by the

proposed warrant. The proposed warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. I understand that if any person present refuses to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

67. I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

## CONCLUSION

68. Based on the information described above, there is probable cause to believe that that, from December 2020 through at least January 2026, in Revere, in the District of Massachusetts, and elsewhere, REZENDE committed wire fraud, in violation of 18 U.S.C. § 1343.

69. Based on the information described above, there is also probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B to the proposed warrant, will be found on the Subject Person described in Attachment A to the proposed warrant.

I declare that the foregoing is true and correct.

Stephen O'Connell DLC
_______________________________
Stephen O'Connell
Special Agent
Internal Revenue Service – Criminal Investigations

Attested to by the applicant by telephone in accordance
with the requirements of Fed. R. Crim. P. 4.1 by

_______________________________
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

on this 10th day of November, 2026